UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

YAAKOV BAR-LEVY,

     Plaintiff,

v.                                              Case No. 8:25-cv-318-KKM-PRL

GINGER CRUZE, in her individual and
official capacity as Principal of
Westport High School, et al.,

     Defendants.

_____

## <u>ORDER</u>

     Yaakov Bar-Levy, a senior at West Port High School, moves for a temporary restraining order and preliminary injunction allowing him to wear a stole displaying the Star of David, the Israeli flag, and a U.S. Army insignia at his graduation ceremony on May 31, 2025. Mot. for Preliminary Injunction (MPI) (Doc. 3). By denying him permission to don that garment at the school's event, Bar-Levy alleges that school officials will violate the First and Fourteenth Amendments and that the World Equestrian Center, the site of the graduation, will violate the Civil Rights of Act of 1964.

The Supreme Court has long held that schools may not ordinarily censor speech based on viewpoint. Had the evidence demonstrated viewpoint discrimination or selective enforcement, the equities otherwise favor a preliminary injunction. But Bar-Levy fails to present evidence that the school discriminates based on religion or viewpoint in prohibiting any non-academically earned stoles and honor cords, so he has not shown a substantial likelihood of success on the merits. I therefore deny his motion.

## I.    BACKGROUND

Bar-Levy is "a devout practicing Jew and a dual citizen of the United States and Israel." Verified Compl. (Doc. 1) ¶ 17. His "Jewish faith is central to his identity and daily life," and he "is active in religious studies and observance, and maintains traditional Jewish customs with the support of his family and community." *Id.* After graduation, Bar-Levy, who has already completed boot camp, will attend college and serve in the National Guard. *See id.* ¶ 18. To represent his faith and future, Bar-Levy seeks to wear a homemade stole at graduation on May 31, 2025. The stole looks like this:



Verified Compl. at 28. One side has the blue and white flag of Israel, including the Star of David, and the other is green and emblazoned with "U.S. Army."

In a meeting earlier this month, Bar-Levy claims that Defendant Ginger Cruze, West Port's principal, informed Bar-Levy's father that, under a school policy, "no modifications to the graduation gown were permitted, and that any deviation from the standard attire would be met with removal from the ceremony." *Id.* ¶ 23; *see id.* ¶ 24 ("Principal Cruze further stated that no exceptions would be granted, even for religious purposes, and refused to consider or discuss any reasonable accommodation."). A follow-up conversation with the "Marion County School

3

District Office" confirmed that Cruze has full authority to set the graduation policy. *Id.* ¶¶ 27–28.

Bar-Levy sued Cruze (in both her official and individual capacities), West Port High School administrator Scott McLain (in his official capacity), countywide Superintendent Diane Gullett (in her official capacity), the Marion County School Board, and the World Equestrian Center (WEC). Verified Compl. ¶¶ 11–15. Bar-Levy brings § 1983 claims against the first four defendants (the government defendants), alleging violations of the Free Speech Clause, the Free Exercise Clause, the Equal Protection Clause, and the Due Process Clause. Verified Compl. ¶¶ 36–56, 63–68.[1] Bar-Levy brings a claim against WEC under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a. *Id.* ¶¶ 57–62. Bar-Levy also brings a *Monell* claim against the School Board and Gullett and a "chilling effect" § 1983 claim against all defendants. *Id.* ¶¶ 69–72.

Shortly after filing his complaint, Bar-Levy moved for a temporary restraining order and a preliminary injunction. MPI. I held an evidentiary hearing on May 27, 2025. (Doc. 22). In support of his motion, Bar-Levy presented evidence of the

---

[1] With respect to McLain, Bar-Levy brings only the free-speech claim.

religious significance of the symbolism on his stole. Rabbi Bar-Levy Decl. (Doc. 16 at 3–4) at 1–2. Bar-Levy and his father, an ordained Jewish rabbi, also testified that the school selectively enforced its graduation policy. *See also* Verified Compl. ¶ 21 (alleging that "[s]imilar forms of graduation expression - such as leis, cords, and cultural symbols - have routinely been permitted or overlooked in . . . [West Port] High School ceremonies."). But when pressed, both Bar-Levy and his father failed to identify any exemptions that West Port had granted to graduating students or identify any violations that West Port routinely tolerated.

In response, the defendants provided more evidence about the policy. Cruze testified that the Marion County School Board delegates to each school principal the discretion to set the rules for permissible dress at graduation. *See also* Marion County Public Schools 2024-2025 Code of Student Conduct Secondary (Doc. 19 (4–66)) at 32 ("Regulations in reference to grooming and dress for special activities such as athletics, fine arts and drill team will be governed by the immediate person in charge of these activities under the direction of the principal."). As for West Port's current policy, Cruze testified that students are allowed to wear honor cords that correspond to approved academic clubs and career and technical certifications, as well as three stoles predicated on academic achievement. *See also* (Doc. 19) at 69–

5

78 (West Port graduation programs identifying "Honor Stoles & Cords" and "Academically Earned Recognition Cords"); *id.* at 151, 153 (West Port website providing that "Students may only wear academically earned stoles and honor cords. The academically earned stoles approved for the Class of 2025 are: West Port Latin Honors Stole, Phi Theta Kappa Stole, and AP Capstone Stole"). Students are not allowed to decorate their caps. These restrictions, Cruze testified, serve West Port's goal of celebrating academic achievements.

Despite receiving requests, Cruze testified that she has never granted an exception to these policies in the eight years that she has served as principal. Cruze is also unaware of any other school principal in Marion County granting any sort of exception at graduation ceremonies. To prevent students from wearing non-compliant garb, Cruze stated that school employees screen graduating students as they enter the venue. This screening process, admittedly, is not entirely foolproof, as sometimes a student may slip through undetected or get handed something as the student walks in. In such a scenario, Cruze said that she would not "wrestle somebody on the stage" to prevent a student walking in an unapproved garment. Cruze noted that, despite having staff dedicated to quietly and unobtrusively enforcing the rules, policing the approximately 750 students at graduation when held

6

at WEC complicates perfect compliance with the dress code.

Adam Langenmayr, who has served as West Port's graduation coordinator since 2014, testified similarly. West Port's policy, Langenmayr stated in his affidavit, "accomplishes West Port's primary objective of conducting a ceremony to commemorate each graduate's academic achievements, and to provide a memorable and positive experience for all graduates." Langenmayr Aff. (Doc. 20 (11–17)) ¶ 10. Although the final decision does not rest with him, Langenmayr has always refused to grant any exception. *Id.* ¶¶ 12, 14. To Langenmayr's knowledge, the last three West Port principals have "refused p[ro]spective graduate requests to wear personal adornments" during graduation. *Id.* ¶ 15. Most of the time, West Port staff has been able to discover and confiscate unauthorized garments at graduation. *Id.* ¶ 18. "Occasionally, however, some items may not be located prior to the student walking during graduation. Regardless, students adorning or displaying any garment or item other than the ones [approved by the policy] is not permitted or endorsed by West Port." *Id.* Finally, although Langenmayr has not, before now, formally memorialized this policy, he states that "[w]ith potentially minor changes, [the] policy has remained mostly the same" since he started as Graduation Coordinator. *Id.* ¶ 19.

7

## II.   LEGAL STANDARD

To warrant a preliminary injunction, a movant must establish (1) "a substantial likelihood of success on the merits;" (2) "irreparable injury" without an injunction; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam); *accord Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Since a "preliminary injunction is an extraordinary and drastic remedy," a court is not to grant it "unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). Accordingly, "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1198.

## III.   ANALYSIS

In his motion, Bar-Levy argues that he has a substantial likelihood of success on the merits with respect to his free-speech, free-exercise, equal-protection, and

due-process claims as well as his claim against WEC under the Civil Rights Act. MPI at 7–9, 11–17. I disagree and therefore deny Bar-Levy's motion.

### A. Free-Speech Claim

Through incorporation of the First Amendment, the government defendants are forbidden from "abridging the freedom of speech." U.S. CONST. amend. I; *see Gitlow v. New York*, 268 U.S. 652, 666 (1925). Bar-Levy argues that he has a substantial likelihood of success on the merits of his free-speech claim because the school's policy draws lines based on both content and viewpoint and the government defendants cannot satisfy strict scrutiny. MPI at 8. The unwritten nature of the policy, Bar-Levy contends, only confirms its likely unconstitutionality. *Id.* at 11. The government defendants argue in response that Bar-Levy does not have a substantial likelihood of success on the merits because the graduation ceremony is a school-sponsored event and West Port's restriction is "reasonably related to legitimate pedagogical concerns." Resp. (Doc. 20) at 7 (quoting *Griffith v. Caney Valley Pub. Schs.*, 157 F. Supp. 3d 1159, 1163 (N.D. Okla. 2016)). Under governing law, I agree with the defendants.

Although a public-school student does not lose his right to speak when he passes through the "schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch.*

*Dist.*, 393 U.S. 503, 506 (1969), the scope of the right is not "automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The standards that apply in adjudging a school's regulation of speech "depend on the nature of the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). In both limited public fora—which arise when the government "reserv[es] [the forum] for certain groups or for the discussion of certain topics," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)—and nonpublic fora—which constitute "property at which the government 'act[s] as a proprietor, managing its internal operations,' " *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017) (alteration in the original) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015))—the government may "impose restrictions on speech that are reasonable and viewpoint neutral," *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 872 (11th Cir. 2011).

"Within scholastic nonpublic fora, there are four clear categories of expression: vulgar expression, pure student expression, government expression, and school-sponsored expression." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (per curiam). The fourth category considers the extent of

"educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," and the First Amendment requires less of the school in that context. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). In *Hazelwood*, for example, the Supreme Court held "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. This is a much more forgiving standard than *Tinker*, which concerns "pure [student] speech" and allows for regulation only when the student's articulation of a "particular expression of opinion" "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students." 393 U.S. at 508–09.

Bar-Levy argues that *Tinker* governs;[2] the defendants respond that *Hazelwood* controls. Eleventh Circuit precedent cuts in the latter direction. School-

---

[2] At the evidentiary hearing, Bar-Levy's counsel suggested that the school's graduation is a "limited public forum." Even if true, this difference would be immaterial to the outcome. After all, the normal standard for both limited and nonpublic fora is the same: the government must act reasonably and in a viewpoint-neutral manner. *See Summum*, 555 U.S. at 470 (limited public fora); *Keeton*, 664 F.3d at 872. West Port's policy is "reasonable in light of the purpose served by the forum," *Rosenberger*, 515 U.S. at 829 (quoting *Cornelius v. NAACP Legal Def. & Educ.*

sponsored speech, like in *Hazelwood*, is "all expression that (1) bears the imprimatur of the school, and (2) occurs in a curricular activity." *Bannon*, 387 F.3d at 1214. "[E]xpressive activities are curricular so long as they are merely (1) 'supervised by faculty members,' and (2) 'designed to impart particular knowledge or skills to student participants and audiences.' " *Id.* (quoting *Hazelwood*, 484 U.S. at 271).

As for whether the graduation "bears the imprimatur of the school," I find persuasive an out-of-circuit opinion that compares a graduation ceremony to a theatrical production. *See Dreaming Bear v. Fleming*, 714 F. Supp. 2d 972, 988 (D.S.D. 2010) ("A graduation proceeding is a theatrical production in a sense—the actors, director, and stage crew, or rather the students, administrators, teachers, and staff members, hope to convey a message the audience will understand and appreciate."). Among other things, the school communicates its message celebrating academic achievement by prescribing the academic regalia worn at the ceremony and providing attendees with a bulletin explaining each adornment's meaning. *See* (Doc. 19) at 76–78 (2025 West Port Graduation Bulletin). Given the school's involvement in curating the graduation ceremony, "students, parents, and members of the public

---

*Fund, Inc.*, 473 U.S. 788, 806 (1985)), and, as discussed below, Bar-Levy fails to present evidence that West Port applies the policy in a viewpoint-based way.

might reasonably perceive" any student speech as receiving the school's approval. *Hazelwood*, 484 U.S. at 271; *see Griffith v. Caney Valley Pub. Sch.*, 157 F. Supp. 3d 1159, 1164 (N.D. Okla. 2016) ("Given the degree of control the school exercised over this event, observers reasonably could have perceived the expressions made through the students' graduation regalia as bearing the imprimatur of the school.").

When it comes to whether the activity is "curricular," the graduation is "supervised by" Langenmayr and Cruze, among other "faculty members." *Bannon*, 387 F.3d at 1214. And West Port's graduation is designed "to impart particular knowledge or skills to student participants and audiences.' " *Id.* (quoting *Hazelwood*, 484 U.S. at 271). At issue in *Bannon* was a school beautification project that involved students painting murals. *Id.* at 1210. The Eleventh Circuit concluded that "the beautification project was designed to impart particular knowledge and skills to student participants and audiences; it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit, among other things." *Id.* at 1215. Here, the school officials explained that the school's graduation is designed to "present a unified sense of the class at graduation" and "honor individual academic achievements." In other words, the school's graduation allows the audience to

13

"appreciate" the students' academic work and "promote[s] school spirit." *Bannon*, 387 F.3d at 1215. It follows that Bar-Levy's planned expression would "occur[] in a curricular activity." *Id.* at 1214.

Because any expressive activity is school-sponsored, West Port's policy will withstand constitutional scrutiny if it is "reasonably related to legitimate pedagogical concerns" and viewpoint neutral. *Id.* at 1213–15. On the current record, both requirements are met.

First, the school's policy—which allows for the donning of only pre-approved academic stoles—is reasonably related to the legitimate pedagogical goal of celebrating academic achievement. *See, e.g.*, *Griffith*, 157 F. Supp. 3d at 1164 (explaining that the policy at issue "allows the school to reserve special recognition for student achievement or participation in school-related activities"); *Dreaming Bear*, 714 F. Supp. 2d at 990 (explaining that the policy at issue "furthers the school board's interest in demonstrating the unity of the class and celebrating academic achievement"). The policy also allows the school to avoid endorsing specific policy or religious positions. *See, e.g.*, *Griffith*, 157 F. Supp. 3d at 1164 (collecting cases recognizing this interest). *But cf. Carson v. Makin*, 596 U.S. 767, 781 (2022) (noting the limits of a state's antiestablishment interest).

14

Second, there is not enough evidence in the record to conclude that the government defendants are engaged in viewpoint discrimination. At the hearing, Bar-Levy's counsel suggested that, for this inquiry, I should consider the school district's policy—which delegates discretion to each principal—rather than West Port's policy that liquidates Cruze's exercise of discretion. Either way, Bar-Levy's evidence is insufficient. As for West Port, the school codified on its website its longstanding, viewpoint-neutral policy allowing for the wearing of only academic stoles. (Doc. 19) at 151, 153; Langenmayr Aff. ¶¶ 6–15, 19. Although Bar-Levy alleges that "[s]imilar forms of graduation expression - such as leis, cords, and cultural symbols - have routinely been permitted or overlooked in past [West Port] High School ceremonies," Verified Compl. ¶ 21, Bar-Levy walked this allegation back during the evidentiary hearing, testifying that he was unaware of any exemption. Bar-Levy's father was similarly unable to identify such an exemption at West Port. *Id.* Indeed, Bar-Levy's counsel could not point to any such evidence either.

As for district-wide evidence, Bar-Levy's counsel relied on vague testimony from Bar-Levy's father that suggested he witnessed deviations at other schools' graduation ceremonies. Bar-Levy's father did not identify what those instances

included, how many, or any other specific details. Given Bar-Levy's burden, this testimony is far from enough to establish that the school district's policy is applied in a viewpoint-based manner. Therefore, no matter which policy is examined—whether West Port's or the district's—Bar-Levy has not established a substantial likelihood of success on the merits.

Under precedent, Bar-Levy's planned expression of wearing a stole at graduation would be school-sponsored speech. Because the challenged policy "is "reasonably related to legitimate pedagogical concerns" and viewpoint neutral, *Bannon*, 387 F.3d at 1213–15, Bar-Levy has not shown a substantial likelihood of success on the merits.

## B. Free-Exercise Claim

Bar-Levy also argues that the policy violates his First Amendment right to freely exercise his religion. MPI at 7–10. I conclude that Bar-Levy fails to show a substantial likelihood of success on the merits of this claim as well.

The First Amendment, as incorporated in the Fourteenth Amendment, provides that States may not "prohibit[] the free exercise" of religion. U.S. CONST. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). To successfully challenge a law or rule as violating the Free Exercise Clause, a plaintiff must show

16

"that the government has impermissibly burdened one of [his] 'sincerely held religious beliefs.'" *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1246 (11th Cir. 2019) (quoting *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007)). Put another way, a plaintiff must show that "(1) [he] holds a belief, not a preference, that is sincerely held and religious in nature, not merely secular; and (2) the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief." *Id.* (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256 (11th Cir. 2012)).

If this threshold showing is met, the showing the government must make to sustain its practice depends on the nature of the regulation. If the challenged rule is both neutral and generally applicable, *see Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990), the government need only show that it has a rational basis for the policy, *see, e.g., Thai Meditation Ass'n of Ala. Inc. v. City of Mobile*, 83 F.4th 922, 928 (11th Cir. 2023). If, on the other hand, the rule is motivated by antireligious animus, *see Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993), or the rule applies differently to religious contexts than secular ones, *see Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021), then the government must satisfy strict scrutiny, *see Kennedy v. Bremerton*

17

*Sch. Dist.*, 597 U.S. 507, 525 (2022).

Assuming without deciding that Bar-Levy has shown a burden on a sincere religious belief in the prohibition on wearing the stole, he nevertheless fails to show a constitutional violation under *Smith*. None of the evidence presented through the papers or at the hearing supports an inference that West Port's policy is not neutral and generally applicable. The policy is facially neutral as to religion—no non-academic expressive stoles are allowed, religious or not. *See* Verified Compl. ¶¶ 23–24.[3] As noted above, neither Bar-Levy nor his father could identify any exceptions to the policy, and Cruze testified consistently that she has never granted an exception. Finally, Bar-Levy's counsel admitted he could not point to any way in which the school's policy was not neutral and generally applicable. The policy therefore faces rational-basis review, *Thai Meditation Ass'n*, 83 F.4th at 928, and

---

[3] To the extent that Bar-Levy challenges the policy's neutrality based on hostility toward his religious beliefs, his evidence is insufficient. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018). Bar-Levy echoes his father's claim that the policy was motivated by animus because Cruze's "tone" was "dismissive and authoritarian" and she "smirked" during the interview, Verified Compl. ¶ 26, and his father testified that "[t]hey were just not being professional and laughing about the situation." These vague allegations fall far short of the language the Supreme Court found adequate to show animus in *Masterpiece Cakeshop*. *See* 584 U.S. at 635 (recounting the Colorado Civil Rights Commission as "describ[ing] a man's faith as 'one of the most despicable pieces of rhetoric that people can use' "). More, Cruze "strongly disagree[s]" with Rabbi Bar-Levy's "characterization" of the meeting. Cruze Aff. ¶ 8. Accordingly, Bar-Levy has not persuaded me that the policy or its application against him was motivated by antireligious prejudice.

Bar-Levy does not argue that he can prevail under that standard, *see* MPI at 8–9.

Accordingly, Bar-Levy has not shown a substantial likelihood of success on his free-exercise challenge.

## C. Other Claims

Bar-Levy also mentions his due-process and equal-protection claims, which he bases on the unwritten policy and alleged uneven enforcement. MPI at 9, 11–13. As for his equal-protection claim, the school policy does not distinguish based on a protected characteristic. Nor has Bar-Levy shown that it is applied in a discriminatory way. Thus, Bar-Levy lacks a substantial likelihood of success on the merits. *Cf. Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (applying "rational-basis scrutiny to [the plaintiff's] equal protection claims" when the challenged program did not violate the Free Exercise Clause).

As for due process, Bar-Levy does not provide support for the proposition that the government defendants failed to provide him with the process he was due. The record proves the opposite. Bar-Levy received notice of the policy and then met with the principal and other administrators. He then had a hearing in federal court. Accordingly, Bar-Levy does not have a substantial likelihood of success on the merits of his due process claim. *See S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)

("Due process requires notice and an opportunity to be heard.").

Given the lack of merit in Bar-Levy's constitutional claims against the school officials, Bar-Levy also lacks a substantial likelihood of success on the merits regarding his *Monell* claim against Gullett and the School Board. *See Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1129 (11th Cir. 2023) ("A *Monell* claim is derivative of—and so requires—an *actual* constitutional violation by an officer."), *cert. denied sub nom. Land v. Edenfield*, 144 S. Ct. 1349 (2024); *see also Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694–95 (1978). And because Bar-Levy has provided no indication that WEC can remedy his stated injuries, *see* Resp. at 1 n.2, Bar-Levy lacks standing to seek an injunction against WEC, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (citation omitted)); *Tokyo Gwinnett, LLC v. Gwinnett County*, 940 F.3d 1254, 1262 (11th Cir. 2019) ("[A] plaintiff must establish standing for each type of relief sought."). In any case, there is no evidence that WEC has a policy that discriminates based on religion or that WEC is acting in concert with the government defendants to enforce such a policy. Bar-Levy has thus not shown a likelihood of success on the merits of his other claims.

20

## D. Remaining Preliminary Injunction Factors

Though Bar-Levy's failure to show any likelihood of success on the merits is "fatal" to his request for a preliminary injunction, *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1198, for completeness I consider the other three factors.

First, irreparable harm is ordinarily presumed in First Amendment cases, so that factor cuts in Bar-Levy's favor. *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Wacko's Too, Inc. v. City of Jacksonville*, 658 F. Supp. 3d 1086, 1128 (M.D. Fla. 2023), *aff'd,* 134 F.4th 1178 (11th Cir. 2025).

Second, the potential harm to Bar-Levy outweighs the potential harm to the government defendants. Bar-Levy will graduate high school only once, and the harm of being unable to express himself and practice his religious beliefs in his preferred way at that graduation is significant. On the other hand, the dilution of the school's message of the value of academic achievement is less.

Third, the public interest is mostly neutral. On one hand, protecting First Amendment rights is in the public interest. *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). But Bar-Levy has not shown a likely First Amendment violation. On the other hand, the public has an interest in orderly public-school graduations, in the celebration of academic accomplishment, and in

21

the administration of the public schools by democratically elected school boards and their delegees, rather than federal judges. *Cf. Missouri v. Jenkins*, 515 U.S. 70, 131–32 (1995) (Thomas, J., concurring) (explaining that school officials "are better equipped than a single federal judge to make . . . day-to-day policy, curricular, and funding choices").

Despite some support in the other three factors, Bar-Levy's lack of likelihood of success on the merits is conclusive here. Bar-Levy's principal aim is to wear his stole to graduation and granting a preliminary injunction would allow just that. In essence, the grant of a preliminary injunction is equivalent to victory on the merits. He should thus have to make a strong showing that he is entitled to such a victory. *Cf. Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001) ("The only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would 'render a trial on the merits largely or completely meaningless.'" (quoting *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995))). As he has not done so, a preliminary injunction is unwarranted.

## IV.  CONCLUSION

Bar-Levy's desire to celebrate his faith and military service to our Country is admirable. But based on precedent and the absence of evidence of viewpoint or religious discrimination, Bar-Levy has failed to demonstrate a substantial likelihood of success on the merits of his claims. Accordingly, it is **ORDERED** that plaintiff Yaakov Bar-Levy's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3) is **DENIED.**

**ORDERED** in Ocala, Florida, on May 29, 2025.

Kathryn Kimball Mizelle
United States District Judge